UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at Covington

| | | |
|---|---|---|
| KHASAN UMAROV, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:26-cv-00040-SCM |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| SAMUEL OLSON, et al., | ) | |
| | ) | |
| Respondents. | ) | |

*** *** *** ***

The Petitioner, Khasan Umarov, is a Russian citizen who is detained by United States Immigration and Customs Enforcement at the Campbell County Detention Center. [Dkt. 1 at 1]. The Petitioner filed a Petition for a Writ of Habeas Corpus seeking immediate release or, in the alternative, a bond hearing. [*Id.* at 13]. The Petitioner most recently filed a Petition for a Writ of Mandamus. [Dkt. 12]. For the following reasons, the Petition for a Writ of Habeas Corpus will be denied.

## I. Facts

The material facts are undisputed. The Petitioner is a citizen of Russia who is charged with being removable by reason of not possessing a valid entry document at the time he sought admission to the United States. [Dkt. 3-1; Dkt. 3-2]. He is currently held in the Campbell County Detention Center in Newport, Kentucky, under federal custody and is subject to removal proceedings. [Dkt. 1 at 1, 8; Dkt. 3 at 1, 2].

The Petitioner presented himself for inspection at the San Ysidro port of entry on January 18, 2023, using the Department of Homeland Security's ("DHS") CBP One process. [Dkt. 1 at 7; Dkt. 3-1 at 1]. At his appointment, DHS found that he was an "arriving alien" who had "applied for admission" to the United States. [Dkt. 3-1 at 1]. DHS issued the Petitioner a Form I-831, Notice to Appear, charging him with inadmissibility under § 212(a)(7)(i)(I) of the Immigration and Nationality Act ("INA") for lacking "a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [INA]," a removable offense. [*Id.* at 1, 4]. Then DHS paroled the Petitioner into the United States for humanitarian reasons under 8 U.S.C. § 1182(d)(5)(A). [*Id.* at 1; Dkt. 3-2 at 2; Dkt. 1 at 7]. Importantly, DHS granted the Petitioner parole for one year. [Dkt. 1-1 ("Admit Until Date: 2024 January 17")]. Sometime after his release, the Petitioner applied for asylum. [Dkt. 1 at 7].[1]

The Petitioner has been detained since approximately November 2025 when he was taken into custody in the course of his employment as a truck driver. [*Id.* at 1, 7; Dkt. 3-3 at 2]. In January 2026, the Petitioner applied for bond, [Dkt. 1 at 8], which the immigration judge denied, [*id.*; Dkt. 1-3]. The Petitioner thereafter filed the instant Petition for a Writ of Habeas Corpus seeking immediate release or a bond

[1] The Court notes, however, that the record is bare regarding the Petitioner's asylum application and its current disposition. Some forms of lawful status—like asylum—do not qualify as "admission." *See Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). But this point is not germane to the matter at hand.

hearing. [Dkt. 1 at 13]. Crucially, the Petitioner concedes that he is an "arriving alien" and 8 U.S.C. § 1225(b)(2) governs his detention. [*Id.* at 8].

## II. Analysis

This case presents another opportunity for this Court to discuss the contours of 8 U.S.C. § 1225(b) and what, if any, process is owed to a noncitizen detained under this statute. A noncitizen who presents at a port of entry seeking admission to the United States without a valid entry document is subject to mandatory detention under § 1225(b)(2). This is equally true when a noncitizen receives temporary parole, overstays the time limit imposed as a condition of parole, and is later detained well within the borders of the United States. In such a scenario—like the Petitioner's here—the noncitizen's legal status reverts to the legal status held at the time of presentment at a port of entry, which is that of an arriving alien seeking admission. The Petitioner's choice to overstay his welcome means he is properly detained under § 1225(b) as an "arriving alien" because neither his parole into the United States nor the end of his parole changed his pre-existing legal status. And since detention is mandatory in this context, the Petitioner is receiving the due process that Congress has authorized.

The Petitioner does not contest his "arriving alien" status or that § 1225(b)(2) governs his detention. [Dkt. 1 at 8]. Instead, he challenges the *application* of § 1225(b). [*Id.*]. In his view, his due-process rights are violated because his "confinement constitutes non-punitive civil detention." [*Id.* at 10]. Relying on the three-part balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), the

Petitioner argues that: (1) he has an earned liberty interest in being free from physical detention; (2) his detention does not align with the statutory goals of § 1225(b) to prevent "flight and protect[] the community from danger" and he is therefore at a heightened risk of being deprived of his earned liberty interest; and (3), his "significant private interest in liberty" outweighs the Government's interest in detaining him. [*Id.* at 10–13]. The Petitioner concludes that his detention deprives him of due process under the *Mathews v. Eldridge* factors.

The Petitioner's sole alternative argument is that he is "not anymore seeking admission" to the United States. [Dkt. 7 at 2]. To buttress this argument, the Petitioner invokes the Sixth Circuit's recent decision in *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026), *petition for cert. filed*, No. 25-1415 (U.S. June 24, 2026), for the proposition that "an 'applicant for admission' is not necessarily 'seeking admission.'" [*Id.* at 2 (citing *Lopez-Campos*, 175 F.4th at 732)]. In short, the Petitioner's position is that because he was paroled into the United States from a port of entry and is no longer seeking to be admitted to the United States, mandatory detention is "plainly wrong." [*Id.*].

The Government argues that relying on *Lopez-Campos* is inappropriate, [Dkt. 11], and that, because the Petitioner agrees that § 1225(b)(2)—not 8 U.S.C. § 1226—applies to his detention, the Petitioner remains an "arriving alien" as a matter of law subject to mandatory detention under § 1225(b)(2), [Dkt. 3 at 2]. This, the Government says, means that he is properly detained without a bond hearing. [*See id.* at 12 ("Bond has never been allowed for arriving aliens")]. The Government

asserts that the Petitioner is designated as an "arriving alien" because he presented himself at a port of entry and applied for admission. [*Id.* at 1, 2]. And therefore the Government contends that as an "arriving alien," neither the fact of his parole into the United States nor his later re-detention change his status or the statutory scheme under which he is detained. [*Id.* at 3–7]. The Government's position is essentially that because the Petitioner could have been mandatorily detained and processed for removal when he was encountered at a port of entry, his due-process rights remain the same now as they were then, and he may now be mandatorily detained under the same authority despite the passage of time.

For the reasons below, the Court concludes that the Government is correct, meaning that the Petitioner is properly detained under § 1225(b)(1) or § 1225(b)(2). The Court further concludes that the Sixth Circuit's opinion in *Lopez-Campos* does not control under the distinct facts and procedural history presented by the Petitioner's case. *See Toruno v. Minter*, Case No. 2:26-cv-02732-BCL-cgc, 2026 WL 1990452, at *1 (W.D. Tenn. July 9, 2026) (holding that *Lopez-Campos* does not apply to aliens who are detained at the border and apply for admission). And, finally, the Court concludes that § 1225(b)'s statutory scheme does not convey the due-process rights the Petitioner seeks. Thus, the Court will deny the Petitioner's Petition and dismiss it with prejudice.[2]

---

[2] The Court is aware that the Petitioner filed a Petition for a Writ of Mandamus before the Sixth Circuit. [Dkt. 12]. Recognizing that the filing of such a petition does not divest a district court of jurisdiction or have the effect of staying proceedings in the district court, *see, e.g.*, *Goods v. Daley*, No. 2:24-138-DCR, 2025 WL 1746876, at *1 n.1 (E.D. Ky. June 24, 2025) (citing *Hill v. United States*, Nos. 02-CR-0728 (DRH) &

### A. The Petitioner is properly detained under 8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1225(b)(2) because his parole did not change his status as an arriving alien.

Before getting to the Petitioner's central claim that the application of his detention violates his due-process rights, the Court must first discuss the implications of being an "arriving alien" subject to detention under 8 U.S.C. § 1225(b)(2). Why? Because being an arriving alien subject to § 1225(b)'s mandatory detention scheme directly informs how much process is due. The bottom line is that the Petitioner was subject to mandatory detention as an "arriving alien" when he presented himself at a port of entry and sought admission, and his parole into the country did not change that status. Thus, he is still an "arriving alien," and the termination of his parole means that he must be detained once again.[3]

To set the stage: Arriving aliens are generally required to be ordered "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."

---

09-CV-4499 (DRH), 2017 WL 6624408, at *2 (E.D.N.Y. Sep. 20, 2017); *Farrell v. US Bank Nat'l Ass'n*, No. 14-11781, 2015 WL 13035017, at *1 n.1 (E.D. Mich. Jan. 15, 2015); *Nascimento v. Dummer*, 508 F.3d 905, 910 (9th Cir. 2007)), this Court has endeavored to provide the Petitioner with a final resolution of the Petition for a Writ of Habeas Corpus so that the complex issues raised in the habeas petition can be considered through *de novo* appellate review rather than the more restrictive process involved in seeking a writ of mandamus.

[3] The Court recognizes that this issue is unsettled and that other courts have found it to be a "close question." *Cabrera Martinez v. Marich*, 816 F. Supp. 3d 356, 373 (W.D.N.Y. 2025); *see also id.* at 365 ("The harder question—on which there is not yet any binding authority—is what happens to the 'entry fiction' after parole ends? Put another way, once a previously paroled noncitizen has been living in the United States outside parole for a period of time, what is the person's status?").

8 U.S.C. § 1225(b)(1)(A)(i). But if they express a credible fear of persecution, then they "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). However, they may also be temporarily paroled into the United States on a case-by-case basis for urgent humanitarian reasons or significant public benefit pursuant to 8 U.S.C. § 1182(d)(5)(A).[4] That is what evidently took place here.

A grant of parole does not change the noncitizen's legal status, though. The Supreme Court has explained that "[w]hen an alien arrives at a port of entry—for example, an international airport—the alien is on U. S. soil, but the alien is not considered to have entered the country." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). "On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). This concept—that the border follows an arriving alien paroled into the United States such that the alien is understood to have never "ent[ered]" the country as a matter of law—is sometimes referred to as the "entry fiction." *Rosales-Garcia v. Holland*, 322 F.3d 386, 391 n.2

[4] 8 U.S.C. § 1182(d)(5)(A) reads as follows: "The Secretary of Homeland Security may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

(6th Cir. 2003) (characterizing a noncitizen's physical presence in the United States combined with the lack of "entry" as a "paradox.").

That fiction was articulated at least a century ago in *Kaplan v. Tod*, where the Supreme Court concluded that an alien who was effectively paroled into the United States had "her prison bounds . . . enlarged by committing her to the custody of the Hebrew Society," but "the nature of her stay within the territory was not changed." 267 U.S. 228, 230 (1925). Rather, "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892)). The Supreme Court concluded its opinion in *Kaplan* by noting that while effectively paroled, the noncitizen "is in custody at the limit of the jurisdiction awaiting the order of the authorities," and because "[i]t would be manifestly absurd to hold" that the passage of five years would change the legal status of a noncitizen "held at Ellis Island for deportation," "the same" rule should apply to her. *Id.* at 231. The upshot is that the "entry fiction" operates to fix a noncitizen parolee's status in the eyes of the law, regardless of the parolee's physical location, because parole is a mere extension of grace in difficult circumstances.

Although new statutes governing immigration have been enacted since 1925, the "entry fiction" remains embedded in our law. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *Kaplan* for the proposition that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"); *see also Thuraissigiam*, 591 U.S. at 140 (citing *Mezei* for the proposition that "[l]ike an alien detained after arriving at a port of entry,

an alien like respondent is 'on the threshold'"). And other district courts confronting this question have concluded that the "entry fiction" means that a noncitizen like the Petitioner "returns to the custody, *including the accompanying legal status authorizing such custody*, from which [he] was paroled." *Flores Diaz v. Mullin*, No. 2:26-CV-00639-KWR-JHR, 2026 WL 1481585, at *2 (D.N.M. May 27, 2026) (emphasis added); *see also id.* at n.1 (collecting cases); *Chirinos Chirinos v. Tindell*, No. 3:25-CV-789-CHB, 2026 WL 926941, at *12 (W.D. Ky. Apr. 6, 2026) (holding that "upon the expiration of his parole, [the petitioner] reverted back to his prior immigration status that he held at the time of parole, that is, an applicant for admission actively seeking admission").

The decision in *Flores Diaz* is instructive here. Like the Petitioner in this case, the petitioner in *Flores Diaz* entered the United States and was detained that same day as an arriving alien. 2026 WL 1481585, at *1. Like the Petitioner, she was then paroled and filed an application for asylum. *Id.* Against that backdrop, the court determined that "the text of § 1182(d)(5)(A), application of the entry fiction doctrine, and fundamental separation of powers principles in the field of immigration" compelled the conclusion that "expiration of § 1182(d)(5)(A) parole requires Petitioner to return to the custody, including legal status, from which she was paroled." *Id.* at *2. Thus, because the petitioner was detained under § 1225(b) prior to her parole, the expiration of her parole meant that she was once again subject to detention under § 1225(b). *Id.* at *14–15.

This Court agrees with *Flores Diaz*. Rather than repeating that opinion, the

Court instead briefly recounts the most relevant portions here. The *Flores Diaz* court reached its conclusion first by applying the standard principles of statutory interpretation. The court noted that the word "custody" is undefined in 8 U.S.C. § 1182(d)(5)(A), and so the court gave the term its ordinary meaning "[a]t the point of enactment." *Id.* at *3. "[C]ustody," the court determined, means "[t]he care and control of a thing or person . . . . Also the detainer of a man's person by virtue of lawful process or authority"; and the court further noted that "that '[t]he term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession.'" *Id.* (quoting *Custody*, BLACK'S LAW DICTIONARY (6th ed. 1990)). The court explained that the capacious definition of "custody" was not dispositive, though, and so the court next considered the "broader context of the statute as a whole." *Id.* at *4. After considering that context, the court reasoned that "[i]f the statute intended to confine 'custody' to mean 'physical custody' it would have used the word 'physical,' used the phrase 'in custody,' or used the word 'detention.'" *Id.* at *5. Because it did not, the court reasoned, the petitioner's "prior legal status" must have been included within the statutory phrase "shall forthwith return or be returned to the custody from which he was paroled." *Id.* at *6.

Next, invoking the principle that agency interpretations of statutes are not controlling but may nonetheless have the "power to persuade," the court considered related regulations touching on the issue of parole and custody. *Id.* (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024)). After taking those regulations

into account, the court reasoned that "Congress was aware that the agency had been interpreting the phrase 'return to the custody' to mean 'restored to the status that he or she had at the time of parole'" when the relevant statutory amendments were enacted, and then concluded "that the plain text of § 1182(d)(5)(A) requires that Petitioner be returned to the 'custody,' including the status that authorized such custody, upon the expiration of parole." *Id.* at *6–7.

Finally, the court concluded that the "entry fiction" dispelled any remaining doubt. The court reasoned that "[c]ase law and the interpretations of phrases consistently used throughout pre- and post-IIRIRA versions of § 1182(d)(5) parole, demonstrate that Congress intended that the entry fiction be applied to noncitizens paroled under § 1182(d)(5)(A)." *Id.* at *7. After canvassing a half-century of relevant case law from across the country, the court concluded that "courts that applied the entry fiction to § 1182(d)(5) parole focused on" statutory text that was not "altered by IIRIRA," and because "IIRIRA did not change any of the phrases relied upon by courts, including the Supreme Court, to apply the entry fiction," that means "Congress intended the fiction to continue to be applied." *Id.* at *10. And the court also reasoned that core separation-of-powers principles and "the very purpose of legal fictions" all compelled the conclusion that "§ 1182(d)(5)(A) requires a noncitizen parolee to be returned to the 'custody,' including the accompanying legal status, from which they were paroled." *Id.* at *13–14. This Court agrees with the foregoing reasoning from *Flores Diaz*. In short, "the entry fiction applies to § 1182(d)(5) parole and the 'custody from which he was paroled' includes a noncitizen's initial legal

status." *Id.* at *10. This means that because the Petitioner was subject to mandatory detention under § 1225(b) prior to his parole, he is once again subject to mandatory detention under § 1225(b) after the end of his parole.

This Court acknowledges that other courts have reached the opposite conclusion, and there is a split of authority even within this district. In *Methelus v. Mullin*, for example, another judge in this district held "that the expiration of parole does not return the undocumented immigrant to the status of an 'arriving alien' at the threshold of the United States." No. 26-158-DLB, 2026 WL 1505792, at *5 (E.D. Ky. May 29, 2026). But in *Chirinos Chirinos*, another judge of this district—albeit in a case pending in the Western District of Kentucky—reached the same result as *Flores Diaz*. *See* 2026 WL 926941, at *10–13. With deep respect for the judges who disagree, the undersigned is more persuaded by the reasoning in *Flores Diaz* and *Chirinos Chirinos*. The undersigned is convinced that a proper application of Supreme Court precedent and the statutory scheme governing parole and detention of noncitizens compels the conclusion that the Petitioner is properly detained under either 8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1225(b)(2) as an "arriving alien."

### B. As an "arriving alien" subject to mandatory detention under 8 U.S.C. § 1225(b), the Petitioner is due only the process that Congress has seen fit to provide him.

The Court must reject the Petitioner's central due-process-based challenges to his detention because he is currently receiving the process that Congress has seen fit to provide him. *See Thuraissigiam*, 591 U.S. at 138–40. In *Thuraissigiam*, the Supreme Court reaffirmed the line of precedent establishing that "Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as

a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause." 591 U.S. at 107 (citing *Nishimura Ekiu*, 142 U.S. at 660); *see also id.* at 139 (rejecting the Respondent's argument because "[i]t disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry"). Thus, the Court concluded that "aliens who arrive at ports of entry—*even those paroled elsewhere in the country for years pending removal*—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139 (quoting *Mezei*, 345 U.S. at 215 (emphasis added)). This Court has already concluded that the Petitioner is lawfully detained pursuant to either 8 U.S.C. § 1225(b)(1) or 8 U.S.C. § 1225(b)(2). In such a scenario, Congress has directed one path forward for the Petitioner—proceed through the removal process. Thus, the Petitioner is currently receiving all the process he is entitled to by Congress. And since Congress has spoken this Court is bound by Congress' command.

**C. The Petitioner's remaining arguments are unavailing.**

The Petitioner further urges this Court to follow the lead of other courts whose holdings, if applied, would afford him the relief he seeks.[5] However, the Petitioner's reliance on these sister district court and non-Sixth Circuit opinions remains unpersuasive. In effect, the Petitioner seeks to apply horizonal stare decisis—non-binding legal authority—to advance his due-process claims. Horizonal stare decisis,

---

[5] *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017); *Azalyar v. Raycraft*, 814 F. Supp. 3d 926 (S.D. Ohio 2026); *Rodriguez v. Raycraft*, No. 1:25-cv-1560, 2025 WL 3673583 (W.D. Mich. Dec. 18, 2025); *Ordonez-Lopez v. United States Dep't of Homeland Sec.*, No. EP-25-CV-470-KC, 2025 WL 3123828 (W.D. Tex. Nov. 7, 2025); *Valencia Zapata v. Kaiser*, No. 25-cv-07492-RFL, 2025 WL 2578207 (N.D. Cal. Sept. 5, 2025).

however, simply informs and persuades a court; it does not compel strict adherence or bind this Court to take specific action. What is binding—or mandatory—is a ruling from the Sixth Circuit or the Supreme Court. And until the Sixth Circuit or the Supreme Court says otherwise, the undersigned remains persuaded by the reasoning in *Flores Diaz* and *Chirinos Chirinos* over the legal authority upon which the Petitioner relies.

Finally, the Court rejects the Petitioner's reliance on *Lopez-Campos*. *Lopez-Compos* held that mandatory detention without a bond hearing "applies to certain noncitizens who seek admission into the country, whereas [a] permissive detention scheme [requiring a bond hearing] applies to all other noncitizens pending a decision on their removability, with exceptions." 175 F.4th at 722. As previously discussed, the Petitioner falls squarely into the former bucket. He was deemed an "arriving alien" as a matter of law when he arrived at a port of entry, and the grant of parole never changed his legal status as an "arriving alien." Thus, the expiration of his parole simply returned him to the custody from which he was paroled—including his legal status as an "arriving alien." Put differently, the Petitioner is treated by law as an "arriving alien" who is at the boarder without a valid entry document. On these facts, the Petitioner is subject to mandatory detention under 8 U.S.C. § 1225(b).

## III. Conclusion

The Petitioner has failed to establish that his detention is unlawful. His detention without a bond hearing is compelled by statute, and thus he is not being deprived of his due-process rights. His Petition is therefore denied.

For the reasons set forth above, **IT IS ORDERED** as follows:

1) The Petitioner's Petition, [Dkt. 1], is hereby **DENIED**.

2) This matter will be **DISMISSED WITH PREJUDICE**.

3) A separate Judgment will be entered.

Signed this 7th day of October, 2026.

S. Chad Meredith, District Judge
United States District Court
Eastern District of Kentucky